IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MAHOGANY BOLDEN,                  )
                                  )
            Plaintiff,            )
                                  )
vs.                               )          Case No. 20-cv-150-DWD
                                  )
BEIERSDORF, INC.,                 )
                                  )
            Defendant.            )

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

In this matter, Plaintiff alleges injuries resulting from her use of "Nivea Skin Firming Hydration Body Lotion" (the "Product" or "Lotion") which is manufactured by Defendant Beiersdorf, Inc.  Now before the Court is Defendant's Motion for Summary Judgment (Doc. 99).  Plaintiff filed a response (Doc. 117), to which Defendant replied (Doc. 121).

## Background

This case is simpler than the docket sheet indicates.   Plaintiff purchased Defendant's Lotion from Walmart, Inc.[1]  Plaintiff applied the lotion on or about January 9, 2018.   After applying the lotion, Plaintiff suffered burns, irritation, and permanent

---

[1] Plaintiff originally named Walmart, Inc. as a Defendant in this matter.  The parties filed a joint stipulation of dismissal on October 1, 2021 (Doc. 104).  Fed. R. Civ. P. 41 allows for dismissals of "actions," not "parties" or "claims," meaning that the rule cannot be used to cleave away claims or parties from a larger case. *See Taylor v. Brown*, 787 F.3d 851, 857–58 (7th Cir. 2015). The Seventh Circuit is clear that to dismiss claims or parties from an action that will otherwise continue, a plaintiff must instead file an amended complaint. While the Court acknowledges the plain reading of Rule 41, in this limited instance, and given the procedural posture of this case, judicial economy counseled in favor of allowing Plaintiff to voluntarily dismiss Defendant Walmart, Inc. without filing an amended complaint.  Accordingly, Plaintiff's claims against Walmart, Inc. were dismissed without prejudice (Doc. 105).

damage to her body.  In her amended complaint (Doc. 89), Plaintiff brings five counts against Defendants for strict liability or negligence premised on Defendants' sale of alleged unsafe, dangerous, or defective lotion (Count I), alleged failure to test and/or supply appropriate warnings for its lotion (Count II), a request for punitive damages for disregarding the safety and wellbeing of its customers (Count III), breach of implied warranty (Count IV), and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count V).  Defendant moved to dismiss the complaint, alleging various defenses and a failure to state a claim (Doc. 90).  Defendant also seeks the entry of summary judgment on all counts (Doc. 99).

As further detailed below, the Court will grant Defendant's Motion for Summary Judgment (Doc. 99) on all claims.  Therefore, Defendant's pending Motion to Dismiss (Doc. 90) will be denied as moot.  *See*, *e.g.*, *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 492 (7th Cir. 2011); *Martinez v. Nw. Mem'l Healthcare*, No. 19-CV-04923, 2021 WL 4635798, at *3 (N.D. Ill. Oct. 7, 2021).  The parties' Motions concerning expert testimony (Docs. 98, 103, 107) will also be denied as moot.

## Legal Standard

Summary judgment is proper where the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of triable fact exists only if, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City Of Attica, Indiana*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

2

Defendant, as the movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 323). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e);*Celotex Corp.*, 477 U.S. at 323. The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

A party will successfully oppose summary judgment only if it presents, "definite, competent evidence to rebut the motion." *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). The Court considers the record in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmovant's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). However, the Court accepts the nonmoving party's version of any disputed fact only if supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

Finally, at the summary judgment stage it is not the Court's role to "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015) (citing *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994); *see also Boss v. Castro*, 816 F.3d 910, 914 (7th Cir. 2016) (courts are not required to scour the record looking for factual disputes or piece together

appropriate arguments).  Instead, the Court "is only tasked with deciding whether, based on the evidence of record, there is any material dispute of fact that requires a trial." *Buell, D.Z.*, 796 F.3d at 756.

**Undisputed Facts**

The following facts are undisputed unless otherwise stated.  On January 9, 2018 (or the early morning of January 10, 2018), Plaintiff took a bath (*Plaintiff's Deposition*, Doc. 117-1, at pp. 63-65).  Plaintiff speculated that she used liquid body soap in the bath, which she normally does, but could not recall a particular product that she may have used during her bath (*Id.* at p. 69).  After getting out of the bath, she applied Nivea's Skin Firming Hydration body lotion (the "Lotion" or "Product") to her legs, buttocks, stomach, and breasts (*Id.* at pp. 67-69).  When she applied the Lotion to her breasts, "within seconds" she felt a burning sensation (*Id.* at p. 69).  Plaintiff washed the Lotion off with soap (*Id.* at p. 70-71) and testified that breasts were "raw" and "burned" (*Id.* at pp. 71-73).  Plaintiff then applied gauze, and Neosporin or another antibiotic ointment to her breasts (*Id.* at 75-76).

Plaintiff was observed by a nurse practitioner at the emergency room on the evening of January 10, 2018, and was prescribed Benadryl or another steroid (*Id.* at 77, 83-85).  Plaintiff does not recall if she filled the prescription, and did not scheduled a follow-up appointment (*Id.* at 84-85), but she did discuss her continuing breast issues with her Ob/Gyn because Plaintiff became pregnant in the summer or fall of 2018 after the Lotion incident (*Id.* at 85-87).  Plaintiff claims her breasts never fully recovered and she still experiences "flares" (*Id.* at 114).  She normally takes over-the-counter pain medication

4

during these "flares" (*Id.*).  Plaintiff further had concerns about breastfeeding her infant and chose not to breastfeed her infant because of her injuries (*Id.* at 87-90).

In April 2021, Plaintiff completed a patch allergy test (*Deposition of Dr. Love*, Doc. 100-2, pp. 36-39).  The test was self-administered but was overseen by board-certified dermatologist, Dr. Love (*Id.*).  The patch test tested 36 allergens to see if Plaintiff had a reaction to the allergens (*Id.*).  Dr. Love testified that the patch test included the ingredient "Methylisothiazolinone", which Dr. Love testified was "a common ingredient used in lotions and moisturizers" and also "a common allergen" (Doc. 100-2, pp. 38-39, 43).  Plaintiff was not specifically tested to see if the Lotion caused a reaction (*Id.*).  Plaintiff's patch test revealed that she had a "strong reaction" to three ingredients: "cobalt, diazolidinyl urea and bromopol" (Doc. 100-2, p. 41).  These three ingredients are not found in the chemical make-up of the Lotion (Doc. 100-2, p. 42); (*see also* Doc. 100-3, at ¶ 7).  Plaintiff did not react to "Methylisothiazolinone" during the patch test (Doc. 100-2, p. 42).

Defendant manufactures Nivea's Skin Firming Hydration body lotion (the "Lotion" or "Product").  The Lotion was reformulated in 2015 and available to the public in 2016.  The Lotion has not been reformulated since 2015 (*Deposition of John Volpe*, Doc. 117-3, at p. 131).  The parties represent that Plaintiff used the 2016 formulation of the Lotion.  Defendant estimates that "upwards of a million and a half" bottles of the Lotion are sold by Defendant per year (*Deposition of John Volpe*, Doc. 117-3, at p. 68).  The Lotion's ingredients are listed on the back of the Lotion container (*see* Doc. 100-9), and include: "Water, Glycerin, Isopropyl Palmitate, Alcohol Denat., Glyceryl Stearate SE, Glyceryl

Stearate, C12-15 Alkyl Benzoate, Dimethicone, Butyrospermum Parkii (Shea) Butter, Tapioca Starch, Creatine, Carnitine, Ubiquinone, Phenoxyethanol, Fragrance, Carbomer, Sodium Hydroxide, 1-Methylhydantoin-2-Imide, Sodium Cetearyl Sulfate, Ethylhexylglycerin."  The Lotion further has the following on its label:

**To Use**: Smooth lotion over body twice daily.
**www.NIVEAUSA.com**
Questions? Comments? 1-800-227-4703
. . .

**Caution: Keep out of reach of children**. For external use only. Avoid contact with eyes. Stop use if irritation develops.

(Doc. 100-9).

Defendant had two clinical tests performed on the Lotion (*See* Doc. 102).  The "claim substantiation" test was performed in April and May 2015, for the purpose of testing to substantiate the Lotion's claims that it was "firming and moisturizing." (*Deposition of John Volpe*, Doc. 117-3, pp. 50-51, 53-54).  The test results substantiated the claims for dermatological use and indicated that the Lotion was "well tolerated" and marketable. (*Id.* at pp. 68-69, 143).  Another test was performed in October and November 2018 (*Id.* at pp. 82-83, 85).  Defendant referred to this test as an exaggerated test, designed to test a "more intense, accelerated" quantity of Lotion than a consumer's normal use (*Id.* at pp. 86-87).  The test attempts to trigger or introduce a response from the subjects in order to show that the Lotion is "nonirritating and skin tolerant." (*Id.*).  Defendant's chemist and Senior Manager of Research and Development, John Volpe, testified that the Lotion was "properly tested, found safe, and was released" (*Id.* at p. 143).  He further

testified that the Lotion performs well, sells well, is popular in the market, and he has "never heard any instance of any problem with it" (*Id.* at 144).

Defendant's senior quality assurance manager, Laura Virginia Perez Santos, testified no quality assurance investigations were opened for the Lotion (*Deposition of Laura Virginia Perez Santos*, Doc. 117-6, p. 70).  She further testified that quality assurance investigations are opened when a "trend" is observed after a product launch, such as when there are recurrences of the same concern, repetitions of the same batch number in complaints, or clusters within a similar timeframe (*Id.* at pp. 50-51).  Ms. Santos also testified that Defendant received 7 formal complaints for the Lotion in 2020; 14 in 2019; 13 in 2018; and 20 in 2017 (*Deposition of Laura Virginia Perez Santos*, Doc. 117-7, pp. 83-85). Formal complaints are those complaints which result from a two-step process whereby the complainant contacts Defendant through e-mail, mail, website, or phone call, and then Defendant provides the complainant with a questionnaire form that complainant completes and returns to Defendant along with any medical records or other information from the incident, and a sample of the product for evaluation (*Id.* at pp. 90-92; *Deposition of Laura Virginia Perez Santos*, Doc. 117-6, pp. 22-23, 106-108).

### Analysis

Plaintiff asserts five counts against Defendants in her amended complaint (Doc. 89). The claims are not particularly identified but are appropriately categorized as follows.  Counts I and II are for strict liability or negligence premised on Defendants' sale of the alleged unsafe, dangerous, or defective lotion (Count I) and alleged failure to test and/or supply appropriate warnings for its lotion (Count II).  Count III asserts a request

for punitive damages for disregarding the safety and wellbeing of its customers. Count IV brings a claim for breach of implied warranty, and Count V asserts violations of the Illinois Consumer Fraud and Deceptive Business Practices Act. Defendant seeks the entry of summary judgment on all counts (Doc. 99).

### I.    *Product Liability Claims*

This case is before the Court pursuant to diversity jurisdiction. Thus, the substantive law of Illinois controls the instant dispute, as the parties do not raise a conflict of law issue. *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010). In Illinois, a manufacturer has a nondelegable duty to produce a product that is reasonably safe. *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420 (2002).

Under Illinois law, it is well-settled that recovery in a strict product liability action requires a plaintiff to plead and prove that, "the injury complained of resulted from a condition of the product, that the condition was unreasonably dangerous, and that it existed at the time the product left the manufacturer's control." *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516 (2008), *opinion modified on denial of reh'g* (Dec. 18, 2008) (citing *Sollami v. Eaton*, 201 Ill. 2d 1 (2002)). A court may find a product is unreasonably dangerous based on proof of any one of the following three conditions of the product: a physical defect, a design defect, or a failure of the manufacturer to warn of the danger or to instruct on the proper use of the product. Id.; *see also Show v. Ford Motor Co.*, 697 F. Supp. 2d 975, 980 (N.D. Ill. 2010), *aff'd*, 659 F.3d 584 (7th Cir. 2011) (explaining the elements of strict liability), *aff'd, Show v. Ford Motor Co.*, 659 F.3d 584 (7th Cir. 2011).

Alternatively, Plaintiff's complaint also presents negligent product liability claims. Under Illinois law, a product liability action asserting a claim based on negligence falls within the framework of common law negligence.  *See Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 264 (2007) (citing *Flaugher v. Sears, Roebuck & Co.*, 61 Ill. App. 3d 671 (1978)). Thus, a plaintiff must establish the existence of a duty of care owed by the defendant, a breach of that duty, an injury that was proximately caused by that breach, and damages. *Id.* (citing *Ward v. K Mart Corp.*, 136 Ill. 2d 132 (1990)).

The key distinction between a negligence and strict liability claim is the concept of fault, as a defendant's fault, in addition to the condition of the product, is at issue in a negligence claim. *Id.* (citations omitted); *see also Phillips v. U.S. Waco Corp.*, 163 Ill. App. 3d 410, 417 (1987) ("In a negligence claim, the focus is on the fault of the defendant. In a strict products claim, the focus is on the condition of the product, regardless of fault."). Therefore, it is not enough to show the product is defective or not reasonably safe; the plaintiff must also show that the defendant knew, or in the exercise of ordinary care should have known, of that unsafe condition. *Brobbey v. Enter. Leasing Co. of Chicago*, 404 Ill. App. 3d 420, 430 (2010); *see Gray v. Nat'l Restoration Sys., Inc.*, 354 Ill. App. 3d 345, 359 (2004) ("A duty to warn exists when there is unequal knowledge and the defendant, possessed with such knowledge, knows or should know that harm might occur if no warning is given.").  Moreover, the concept of proximate cause for strict liability and negligence are the same here, and under either theory, proximate cause "cannot be predicated upon speculation, surmise, or conjecture as to the cause of the injuries."

*Schultz v. Hennessy Indus., Inc.*, 222 Ill. App. 3d 532, 540 (1991); *see also Walker v. Macy's Merchandising Grp. et al.*, 288 F.Supp.3d 840, 869 (N.D. Ill. 2017).

### ***Unreasonably Dangerous***

A court may find a product is unreasonably dangerous based on proof of any one of the following three conditions of the product: a physical defect, a design defect, or a failure of the manufacturer to warn of the danger or to instruct on the proper use of the product. *Mikolajczyk*, 231 Ill. 2d 516 (citing *Sollami*, 201 Ill. 2d 1). Plaintiff appears to be pursuing her claims under theories of design defect and a failure to warn.[2] Specifically, Plaintiff argues that the Product was not properly designed or tested to ensure the prevention of reactions and injuries to customers like Plaintiff. Alternatively, Plaintiff argues that the warnings and instructions on the Product were deficient. The Court will address each theory in turn.

### 1.  Design Defect

In order to prove a design defect, Plaintiffs must establish: (1) a condition of the product as a result of design, (2) that made the product unreasonably dangerous, (3) and that existed at the time the product left the defendant's control, and (4) an injury to the

---

[2] A defective condition may arise from harmful ingredients not characteristic of the product itself and from foreign objections contained in the product. *See Smith v. Phoenix Seating Sys, LLC*, 894 F.Supp. 2d 1088, 1093 (S.D. Ill. 2012) (citing *Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517, 522 (7th Cir. 1988). While the parties do not address the "physical defect" theory, the Court observes that Plaintiff is not arguing that a foreign object or other deformity was present in the Lotion she purchased and applied that differed from the Product as a whole. Accordingly, the issue presented here is whether the Product's formula contained harmful ingredients and not whether the particular Lotion Plaintiff used was physically defective. *See* Doc. 117, p. 19 (noting that there is no evidence to suggest that Plaintiff's product had been altered or modified prior to her use).

plaintiff, (5) that was proximately caused by the condition. *Clark v. River Metals Recycling, LLC*, 929 F.3d 434, 439 (7th Cir. 2019) (citing *Mikolajczyk*, 231 Ill. 2d 516).  To prevail, Plaintiff will have to use one of two tests to show that Defendant defectively designed the Product: (1) the consumer expectation test—which asks whether the product is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics"—or (2) the risk-utility test, which balances the magnitude of the danger against the utility of the product as designed. *Calles*, 224 Ill. 2d at 255–59 (citing *Lamkin v. Towner*, 138 Ill. 2d 510, 528 (1990)).

Here, Plaintiff argues that the Lotion was not properly designed or tested to ensure the prevention of reactions and injuries to customers like Plaintiff.  Plaintiff further contends that Defendant's testing of the product was inadequate because of the size and makeup of the studies' participants.  In response, Defendant contends that it cannot be held liable because Plaintiff's injuries resulted from her idiosyncrasies or allergies and not from any defect in the Lotion.

Under Illinois law, a "product, faultlessly manufactured and containing no impurities, is not rendered defective per se, within meaning of the doctrine of strict liability in tort, by the mere fact that it causes injury to certain individuals who, because of hypersensitivity or other peculiarity of makeup, suffer an allergenic or idiosyncratic reaction when exposed thereto." *Smith v. Phoenix Seating Sys, LLC*, 894 F.Supp.2d 1088, 1093 (S.D. Ill. 2012); *see also Presbrey v. Gillette Co.*, 105 Ill. App. 3d 1082 (1982) (Concerning allergic reactions to products, "[t]he unusual susceptibility of the consumer is generally

11

recognized as a complete defense where the manufacturer did not know and had no reason to know that a very few users of his product might be injured," as, "[t]he proximate cause of injury is attributed to the idiosyncrasy or allergy of the plaintiff and not to a failure to warn of a defect in the product."). "The rule barring the idiosyncratic consumer from recovery generally applies whether suit is brought under strict liability, breach of warranty, or negligence." *Presbrey*, 105 Ill. App. 3d at 1092.

Before analyzing the specific application of Plaintiff's alleged idiosyncrasies here, the Court observes a larger issue for Plaintiff's case. Specifically, Plaintiff has failed to allege or identify through her experts any specific defect in the Lotion itself. Although Plaintiff alleges that she suffered an injury from the Lotion, she failed to allege the specific component(s) of the Lotion that she alleges renders the Product unreasonably dangerous. This is problematic for Plaintiff because "a consumer who suffers an allergic reaction to a product *without any identifiable defect* . . . may not invoke the doctrine of strict liability to recover from a manufacturer or seller." *Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517, 522 (7th Cir. 1988) (emphasis added); *Smith*, 894 F.Supp. 2d at 1093; *see also Stanton v. Sears Roebuck & Co.*, 312 Ill. App. 496 (Ill. App. Ct. 1942) (plaintiff bore the burden of presenting evidence that dyes in dress contained any harmful or poisonous substance of any kind)).

Plaintiff argues that it was not her burden to have the Product tested (*See* Doc. 117, pp. 18-19) so she does not identify what ingredient or component of the product is alleged to be dangerous. Instead, Plaintiff contends the Product was in essence *per se* dangerous because it caused a high number of adverse reactions and was not tested on individuals

with similar skin tones as Plaintiff (Doc. 117, pp. 20-21).   Plaintiff also repeatedly questions of the sufficiency of the statistical data from the tests Defendant used in coming to its conclusion that the Lotion was safe for the ordinary consumer, by arguing that the study participants were under-inclusive, did not include any individuals of African American descent, and reported "adverse reactions" to the Lotion that Defendant allegedly did not consider.

While Plaintiff was not required to have the Lotion tested, it is her burden to present evidence that the Lotion contained an identifiable defect.  *See Adelman-Tremblay*, 859 F.2d at 522 (in strict liability action plaintiff must prove a defect and that defect caused her injury) (internal citations omitted); *see also Smith*, 894 F.Supp. 2d at 1093; *Stanton*, 312 Ill. App. 496; *Clark*, 929 F.3d at 439 (To succeed in a design defect claim, Plaintiff must establish "a condition of the product" that "made the product unreasonably dangerous."); *in accord Spiconardi v. Macy's E., Inc.*, 83 A.D.3d 472, 473 (N.Y. App. Div. 2011) ("[C]onclusory allegations raised by plaintiffs' expert, absent evidence that the product violated other relevant industry standards or accepted practices, or statistics showing the frequency of injuries arising out of the use of the product . . . were insufficient to create issues of fact warranting the denial of the motions").

In most cases, products liability actions alleging design defects require expert testimony to prove that a product defect was unreasonably dangerous and proximately caused the plaintiff's injuries.  *See Baltus v. Weaver Div. of Kidde & Co.*, 199 Ill. App. 3d 821 (1990).  Here, Plaintiff offers the opinions of two experts, Dr. Porcia Bradford Love, and Dr. Ilene Zackowitz.  However, neither expert provides an opinion as to what is wrong

with the Lotion or what condition of the product rendered it unreasonably dangerous, either to Plaintiff specifically, or to consumers generally.

Dr. Love is a board-certified dermatologist (Doc. 100-2, p. 8) who examined Plaintiff virtually and by phone approximately five times (Doc. 100-2, pp. 18-19).   Dr. Love first examined Plaintiff in February 2021 (Doc. 100-2, p. 18).   Dr. Love diagnosed Plaintiff with irritant contact dermatitis and hyperpigmentation on her breasts (Doc. 100-2, pp. 24-31).   Dr. Love opined that the dermatitis and hyperpigmentation was caused by "hypersensitivity reaction" from "something topically applied to the skin." (Doc. 100-2, p. 29), and that the Lotion contributed to Plaintiff's dermatitis (Doc. 100-2, p. 85).

Dr. Love also performed a patch test on Plaintiff which Plaintiff self-administered (Doc. 100-2, pp. 36-39).   The patch test considered 36 allergens to determine if Plaintiff had a reaction to the allergens (*Id.*).   Dr. Love stated that she did not give a patch test for the Lotion to see if it caused a reaction, but that the patch test contained the ingredient "Methylisothiazolinone", which Dr. Love testified was "a common ingredient used in lotions and moisturizers" and also "a common allergen" (Doc. 100-2, pp. 38-39, 43). Plaintiff believed that "Methylisothiazolinone" was an ingredient in the Lotion, although it was not (*See* Declaration of David C. Steinberg at Doc. 100-3, at ¶ 7; *see also* Doc. 100-9). Regardless, Plaintiff did not react to "Methylisothiazolinone" during the patch test (Doc. 100-2, p. 42).   She did, however, have a "strong reaction" to three ingredients: "Cobalt, Diazolidinyl urea and Bromopol" (Doc. 100-2, p. 41).   These three ingredients are not found in the Lotion (Doc. 100-2, p. 42; *see also* Doc. 100-3, at ¶ 7; Doc. 100-9).   Dr. Love was unable to identify a specific ingredient in the Product which caused Plaintiff's

reaction (Doc. 100-2, pp. 49, 53, 83).  Further, she gave no opinion on whether the Lotion was unsafe for the ordinary consumer (*Id.*)

Dr. Zackowitz is not a medical doctor but holds a Ph.D. in Industrial/Organizational Psychology (Doc. 98-4, pp. 9-10).  She works in the field of human factors and focuses on the effectiveness and efficiency of work systems (Doc. 98-4, p. 11).  She has no experience in the skin care industry and was not retained in this matter as a skin care expert (Doc. 98-4, pp. 11-12).  Dr. Zackowitz did not provide an opinion on the Lotion in the context of the standards within the cosmetic industry or give an opinion on whether the Lotion complied with any laws or regulations (Doc. 98-4, pp. 52-53, 56). Instead, Dr. Zackowitz opined that from a human factors perspective consumers "need to know" any reactions to products and have a "right to understand everything they possibly can about the products that they chose to buy" (Doc. 98-4, pp. 76-77).   However, Dr. Zackowitz admitted that she had no opinion on whether manufacturer's have a legal duty to disclose any slight or moderate reactions observed in clinical studies (Doc. 98-4, pp. 67-77).  Nor did Dr. Zackowitz provide an opinion on what Defendant's responsibilities are in the cosmetic industry (Doc. 98-4, p. 83) or, to the point at issue, which ingredient in the Lotion was allegedly hazardous:

Q. And what is causing -- what's causing the hazard?

Dr. Zackowitz: Exposure to the product presumably.

Q. What in the product is causing that?

Dr. Zackowitz: That's outside of my area of expertise.

Q. Okay. So appreciating that you don't know what in the formula is allegedly causing skin irritation -- is that true?

Dr. Zackowitz: That is correct, I do not know what -- if there's a specific ingredient, I don't know what that is.

(*See* Doc. 98-4, p. 101).

In sum, Plaintiff has not offered any evidence that there was a defect in the Lotion's formula or design, and her experts could not identify an ingredient which allegedly caused her reaction to the Lotion. At best, Plaintiff speculates that something in the Lotion caused her skin to react in such a way as to cause her injuries. However, speculation, guess, or conjecture, is insufficient to avoid summary judgment. *Schultz*, 222 Ill. App. 3d at 542–43; *Buckel v. Tube Pro Inc.*, 2016 IL App (1st) 150427-U, ¶ 61 ("liability cannot be based on mere speculation, guess, or conjecture") (citing *Zimmer v. Celotex Corp.*, 192 Ill.App.3d 10898, 1091 (1989)). Accordingly, Plaintiff has failed to meet an element of her claim, which is dispositive here. *See Adelman-Tremblay*, 859 F.2d at 522.

Moreover, even if Plaintiff could identify a specific ingredient or defect in the Product, Plaintiff has presented no evidence indicating that the Lotion posed a risk of harm to the ordinary consumer beyond her specific reaction. *See Presbrey*, 105 Ill. App. 3d at 1091 ("The unusual susceptibility of the consumer is generally recognized as a complete defense where the manufacturer did not know and had no reason to know that a very few users of his product might be injured.").

Although not necessary for Defendant's Motion for Summary Judgment, it is worthwhile for illustration purposes to point to the nature of the evidence offered by Defendant through the testimony of Defendant's chemist and Senior Manager of

Research and Development, John Volpe, and Senior Quality Assurance Manager, Laura Virginia Perez Santos (*Deposition of John Volpe*, Doc. 117-3; *Deposition of Laura Virginia Perez Santos*, Doc. 117-7). Mr. Volpe opined that the Lotion was safe within a reasonable degree of scientific certainty based on his experience in the cosmetics industry, the Lotion's testing, its success in the market, and low complaint rates (Doc. 117-3, pp. 144-45). Ms. Santos similarly testified that based on her knowledge and expertise in the cosmetics and quality control industries, and the low complaint rates for the Lotion compared to units sold, that the Lotion was safe (Doc. 117-7). Similarly, Defendant's retained expert, David C. Steinberg, an independent consultant in the field of chemistry and cosmetics regulations, opined that the Lotion was safe based on his fifty years of experience in the cosmetic industry, the low complaint rates, and the Lotions' market response year after year, posing no threat to the ordinary consumer (Doc. 100-3).

Plaintiff repeatedly asks the Court to ignore the studies performed on the Lotion and Defendant's characterization of the data, arguing that the data is skewed and underinclusive because the Lotion was not tested on women of African American ancestry. Plaintiff further argues that Defendant is unilaterally defining what a "severe risk" is by not crediting the reactions which were identified by the subjects in the Lotions' two clinical studies as severe. Instead, Plaintiff postulates that the presence of any adverse reactions in the studies, along with the consumer complaints Defendant received for the Lotion, suggest that the Lotion was dangerous or required further warnings. However, Plaintiff's reliance on her own interpretation of the complaint rates and figures is not enough to create a material issue of fact here. *See Baltus*, 199 Ill. App. 3d 821 (In

most cases, products liability actions alleging design defects require expert testimony to prove that a product defect was unreasonably dangerous and proximately caused the plaintiff's injuries).

While Plaintiff offers the opinion of Dr. Zackowitz as an attempt to discredit the testing data here, her opinion was limited solely to her experience as a human factors expert. In short, her opinion concluded that most consumers would want to know about *any* risk, and that more information is always better for consumers. However, Dr. Zackowitz did not evaluate the data, has no expertise in the cosmetics industries, and could not formulate an opinion on the sufficiency of the Lotion's tests or the significance of the statistical data in relation to the Lotion's compliance with any legal or regulatory framework for cosmetics, or the standard practices within the cosmetics industry itself.

In contrast, Defendant offered the opinion of John Volpe who testified that the tests conducted on the Lotion were "standard tests" within the cosmetics industry and are run to support product launches or to make comparison to new development (*Deposition of John Volpe*, Doc. 101, at pp. 88, 93-94). He further opined that the Lotion was safe for dermatological use within a reasonable degree of scientific certainty (*Id.* at pp. 144-45). Moreover, Defendant's retained expert, Steinberg, stated in his report that the "repeat insult patch test" used on the Lotion is recognized in the industry as being the highest standard testing for safety (Doc. 100-3). Steinberg further opined that the ingredients in the Lotion were safe based on reviewed and published studies, and that the clinical studies confirmed that the Lotion was safe for the ordinary consumer (*Id.*). In sum, Defendant's experts concluded that the Lotion was safe, performs well on the

market, is popular, and has low complaint rates.  Plaintiff's attempt to discredit these opinions based on speculation and conjecture, and without expert testimony, is not enough to create a material dispute of fact.  Accordingly, Plaintiff has not created a material issue of fact here concerning the Lotion's performance to the ordinary customer. *Smith*, 894 F.Supp. 2d at 1093 (a product is not rendered defective per se merely because it causes injury to certain individuals).

Finally, Plaintiff has not negated the possibility of reasonable secondary causes. Plaintiff testified that she used other products, including lotions, body washes, and detergents generally (*see* Doc. 117-1, at pp. 50, 56-58, referencing Plaintiff's general use of NIVEA products, Palmer's Cocoa Butter, Bed Bath & Body Works products, Gain laundry detergent, Febreze, and Vaseline lip products).  She also testified that she applied other products near the time of her reaction to the Lotion (*Id.* at p. 69 indicating that she may have used a liquid body soap in the bath right before her injury, and *Id.* at pp. 75-76 indicating that she applied Neosporin or another antibiotic ointment after her injury). Dr. Love did not consider those other products.  Nevertheless, Dr. Love's opinion is that Plaintiff suffered an allergic reaction to something, without negating the existence of other products Plaintiff used.

Moreover, there is no indication that Dr. Love extrapolates her opinions from identifiable or reliable data or information. "Trained experts commonly extrapolate from existing data," and therefore, "[t]he critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data only by the *ipse dixit* of the expert ... that is properly excluded under Rule

702." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) (internal citation and quotation marks omitted). Instead, it is based on her assumption that because Plaintiff suffered an injury, the Lotion was a contributing cause.  But the fact that an injury occurred does not in and of itself prove that the product is defective. Thus, the failings of Dr. Love's testimony are not due to lack of her credibility or the accuracy of her analysis, but rather due to the lack of reliability and relevance of her opinions.[3]

By contrast, Defendant's experts, Mr. Steinberg and Mr. Vople opined, to a reasonable degree of medical certainty, that the Lotion was safe for the ordinary consumer.  Further, Steinberg provided alternative explanations for Plaintiff's injuries unrelated to the Lotion.  Specifically, Steinberg opined that some of the products commonly used by Plaintiff may contain allergens which her patch test revealed she had adverse reactions to (Doc. 100-3).

Because Plaintiff cannot identify an alleged defect in the Product, she cannot prove, either by direct or circumstantial evidence, that her injuries were caused by the defect.  Accordingly, Plaintiff has failed to present facts to support the elements of her claim of a design defect, and the Court will grant summary judgment in Defendant's favor on these design defect claims.

---

[3] While it is now unnecessary to address the question of the barring of Plaintiff's experts under *Daubert*, it is worthy of note to say that neither Dr. Love nor Dr. Zackowitz suggest that their theories and analyses are generally accepted in the relevant scientific, technical, or professional community. *See Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) ("*Daubert* sets forth a non-exhaustive list of guideposts to consult in assessing the reliability of expert testimony: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the relevant scientific, technical, or professional community.") Both offer little in the way of methodologies and principles that support their opinions and express nothing more than a "bottom line."

2. <u>Failure to Warn</u>

Plaintiff's failure to warn claims center on the fact that she believes Defendant understated the risks of the Product based on consumer complaint data and the reported reactions documented in the testing for the Product.  Specifically, she asserts that Defendant did not adequately warn Plaintiff about the complaint rates or that the Product could cause customers to experience adverse reactions.

To prevail under a failure to warn theory, Plaintiff must show (1) that the manufacturer knew or should have known of the danger presented by the use of the product, and (2) the manufacturer did not warn, in an adequate manner, of the danger. *Westfield Ins. Co. v. Regal Beloit Corp.*, 2015 WL 13619510, at *4 (C.D. Ill. Mar. 31, 2015) (citing *Woodill v. Parke Davis & Co.*, 79 Ill. 2d 26 (1980); *see also Walker*, 288 F. Supp. 3d at 865 (citing *Sollami v. Eaton*, 201 Ill.2d 1, 8) ("A manufacturer has a duty to warn where the product possesses dangerous propensities and there is unequal knowledge with respect to the risk of harm, and the manufacturer, possessed of such knowledge, knows or should know that harm may occur absent a warning.").  However, there is no duty to warn of the risk of harm that is "open and obvious."  *Walker*, 288 F. Supp. 3d at 865 (citing *Gutterman v. Target Corp.*, 242 F. Supp. 3d 695, 705 (N.D. Ill. 2017)).

Here, Plaintiff asserts that Defendant did not adequately warn Plaintiff about the complaint rates or that the Product could cause consumers to experience adverse reactions.  However, these assertions are also based on speculation.  Specifically, when reviewing the sufficiency of the Product's warnings and instructions, Plaintiff's experts

could furnish no opinion on whether the warnings were sufficient under any relevant law or regulation, or within the cosmetic industry itself (*See* Docs. 98-4, 100-2).  Whereas Defendant's experts opined that the Lotion's tests were standard in the industry, and that Defendant's label complied with all applicable regulations and laws (*See* Doc. 101; Doc. 100-3).

Even assuming that the Lotion contained dangerous propensities that proximately caused Plaintiff's injuries (which Plaintiff has not shown), Plaintiff also bears the burden of showing that the *failure to warn* of those dangerous propensities caused her injuries. *Walker*, 288 F. Supp. 3d at 865 (emphasis added).  However, Plaintiff points to no evidence in the record of what additional or alternative warnings were needed to prevent her injuries.  *See Phillips v. The Raymond Corp.*, 2006 WL 1156375, at *8 (N.D. Ill. Apr. 25, 2006) ("[Plaintiff] has failed to suggest a different warning that would be adequate or even better; and has failed to identify a warning that would have caused him to have acted differently or would allegedly have prevented the injury he suffered. Under applicable precedent, a failure-to-warn claim, including one predicated on a strict liability theory, fails under such circumstances.").

Plaintiff simply fails to point to any evidence, circumstantial or direct, for a reasonable jury to conclude that her injuries would not have happened "but for" the insufficient warning on the Lotion "as to make the conclusion of causation more probable as opposed to merely possible." *Baez v. Target Corp.*, 80 F. Supp. 3d 862, 868 (N.D. Ill. 2015). There is also no evidence from which a reasonable jury could conclude that any failure to warn in this case was a "material element" or "substantial factor" in

bringing about Plaintiff's injuries. *Dempsey v. Gen. Elec. Co.*, 2006 WL 733550, at *5 (N.D. Ill. Mar. 21, 2006). Any such conclusion would be based on conjecture; however, "[i]t is axiomatic that liability cannot be premised merely upon surmise or conjecture as to the cause of the injury." *Lee v. Chicago Transit Auth.*, 152 Ill. 2d 432 (1992)

Accordingly, Plaintiff has failed to present facts to support the elements of her product liability claims premised on a failure to warn, and the Court will also grant summary judgment in Defendant's favor on the inadequate warnings claims.

Having found no issue of material fact as to Plaintiff's product liability claims, Plaintiff's request for punitive damages premised on these alleged claims also fails. (*See* Doc. 89, Count III) (incorporating allegations from Plaintiff's product liability claims and asserting that Defendant consciously disregarded the safety, comfort, and wellbeing of its customers). Under Illinois law, "punitive damages may be awarded where a defendant has committed a tort under circumstances showing 'fraud, actual malice, deliberate violence of oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.'" *Dewick v. Maytag Corp.*, 296 F.Supp.2d 905, 907 (N.D. Ill. 2003) (citing *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 186 (1978)); *see also Moore v. Remington Arms Co., Inc.*, 100 Ill.App.3d 1102, 1115 (1981) ("Punitive damages may be assessed against the manufacturer of a product injuring the plaintiff if the injury is attributable to conduct that reflects a flagrant indifference to the public safety."). Plaintiff has not shown that her injuries are attributable to any conduct of Defendant's, let alone conduct that reflects a flagrant indifference to public safety or a wanton disregard of the rights of others. Thus, to the extent Plaintiff's Count III requests

23

separate relief for punitive damages premised on her product liability claims, the Court also grants summary judgment in Defendant's favor on this request.

## II.    _Implied Warranty Claim_

Although the exact implied warranty theories Plaintiff is pursuing are not specifically delineated in her amended complaint, she appears to claim that Defendant breached both the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. (_See_ Doc. 89, Count IV) (alleging, among other things, that Defendant knew the product had a particular purpose: skin firming, and knew that the product was not safe for use on all human bodies and body parts as directed on the label).

Plaintiff's implied warranty of fitness for a particular purpose claim fails out of the gate. "No warranty for a particular purpose is created if the intended use is no different from the ordinary use of the product." _Rosenstern v. Allergan, Inc._, 987 F. Supp. 2d 795, 804 (N.D. Ill. 2013) (citing _Wilson v. Massey-Ferguson, Inc._, 21 Ill.App.3d 867 (1974); _Zaffiri v. Pontiac RV, Inc._, 2012 IL App (4th) 120042-U, 2012 WL 7050429, at *8 ("It is long recognized in Illinois that even where a seller has reason to know of a buyer's particular purpose, no warranty for a particular purpose is created if the intended use is no different from the ordinary use of the product."). Plaintiff's claims for breach of the implied warranty of fitness for a particular purpose are premised only on the Lotion's ordinary use as a lotion, which is how Plaintiff was using the Lotion on the day of her injuries. (_See_ Doc. 100-1, pp. 67-68).  Plaintiff does not point to any evidence showing that the Lotion was intended to be used for anything else other than as Lotion applied as she

applied it. Accordingly, the Court grants summary judgment to Defendant on Plaintiff's claim for breach of the implied warranty of fitness for a particular purpose.

That leaves Plaintiff's claim for breach of the implied warranty of merchantability against Defendant. To prevail on this claim, Plaintiff must establish: "(1) a sale of goods, (2) that the seller of the goods is a merchant with respect to those goods, and (3) that the goods were not of merchantable quality." *Ferraro v. Hewlett-Packard Corp.*, No. 08 CV 03638, 2012 WL 394256, at *12 (N.D. Ill. Feb. 6, 2012), *aff'd sub nom. Ferraro v. Hewlett-Packard Co.*, 721 F.3d 842 (7th Cir. 2013) (citation omitted).   Goods are not of "merchantable quality" if they are "unfit for their intended purpose." *Maldonado v. Creative Woodworking Concepts, Inc.*, 342 Ill. App. 3d 1028 (2003). "Illinois courts have recognized that claims for strict liability and breach of the implied warranty of merchantability are essentially coextensive in products liability actions[.]" *In re Depakote*, No. 14-CV-847-NJR-SCW, 2015 WL 4776093 (S.D. Ill. Feb. 14, 2015); *see also Nave v. Rainbo Tire Serv., Inc.*, 123 Ill. App. 3d 585 (1984) ("The strict liability theory is essentially the liability of implied warranty divested of the contract doctrines of privity, disclaimer and notice." (internal citation and alteration omitted)).

For the same reasons discussed above regarding Plaintiff's design-defect claims, the Court will grant summary judgment against Plaintiff on the implied warranty of merchantability claim. There is no evidence that the Lotion proximately caused Plaintiff's injuries, as discussed above. *See Wheeler v. Sunbelt Tool Co.*, 181 Ill. App. 3d 1088 (1989) ("In an action based upon breach of implied warranty . . . it is necessary to show the existence of the warranty, its breach, and *proximate cause.*" (emphasis added)); *Reed v.*

25

*City of Chicago*, No. 01 C 7865, 2006 WL 3147698, at *6 (N.D. Ill. Oct. 31, 2006) (listing proximate cause as an element of a claim for breach of the warranty of merchantability).

### III.    *Consumer Fraud Claim*

To sustain a claim under the Illinois Consumer Fraud Act, Plaintiff must show: (1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce. *See* 815 Ill. Comp. Stat. Ann. 505/2; *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 501–2 (1996) (citing *Siegel v. Levy Organization Development Co.*, 153 Ill.2d 534, 542 (1992)).  Further, Plaintiff must show the alleged fraud proximately caused her alleged injury. *Connick*, 174 Ill. 2d 482 at 501–2 ("Plaintiff can recover damages under the Consumer Fraud Act *only* for injuries that were proximately caused by the alleged consumer fraud.") (emphasis in original).

Plaintiff alleges that the Product's label is deceiving in stating it "improves skin's firmness," with "Noticeable Smoother Skin," that the product was "dermatologically tested and approved," and provides instructions to avoid the eyes.  However, Plaintiff offers no evidence and points to no facts in the record to show that these statements are deceiving.  Indeed, Plaintiff's experts offered no opinion on the statements.  In contrast, Defendant's experts opined that the Lotion's claims were substantiated by the Lotion's tests.  Moreover, and for the same reasons discussed above, there is no evidence that the Lotion proximately caused Plaintiff's injuries, and thus her consumer fraud claim also fails.  Accordingly, Plaintiff has failed to demonstrate a genuine issue of material fact

here, and the Court will grant summary judgment in Defendant's favor on Plaintiff's consumer fraud claim.

### Conclusion

For the above stated reasons, Defendant's Motion for Summary Judgment (Doc. 99) is **GRANTED**.  As the Court grants the Motion for Summary Judgment on all claims, the Motion to Dismiss (Doc. 90) is **DENIED as moot**.  *See, e.g., Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 492 (7th Cir. 2011)**.**  Further, because Plaintiff has failed to meet the required elements of her claims, the Court need not reach the parties' motions concerning expert testimony (Docs. 98, 103, 107) and those Motions are **DENIED as moot**.

The Clerk of Court is **DIRECTED** to enter judgment in Defendant Beiersdorf Inc.'s favor and against Plaintiff Mahogany Bolden.

SO ORDERED.

Dated:  March 23, 2022

_____
DAVID W. DUGAN
United States District Judge